UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

THEODORAS ZORBAS,

                         Plaintiff,                    **MEMORANDUM & ORDER**
                                                       11-CV-2318 (MKB)

            v.

UNITED STATES TRUST COMPANY, N.A.,
n/n/a U.S. TRUST / BANK OF AMERICA
PRIVATE WEALTH MANAGEMENT and
BANK OF AMERICA, N.A.,

                         Defendants.

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

        Plaintiff Theodoras Zorbas filed the above-captioned action against Defendants United

States Trust Company, N.A. and Bank of America, N.A., in New York Supreme Court, Nassau

County, alleging negligence, negligent misrepresentation, negligent supervision, breach of

fiduciary duty, breach of express and implied contract, and breach of covenant of good faith and

fair dealing. (Docket Entry No. 1.) Defendants removed the action to this Court on May 12,

2011, and now move for summary judgment. (Docket Entry No. 44.) Plaintiff cross-moves for

summary judgment as to his breach of fiduciary duty claim.[1] (Docket Entry No. 43.)

Defendants also move to strike Plaintiff's claim for damages, and to strike portions of Plaintiff's

affidavit submitted in response to Defendants' motion for summary judgment as inadmissible.

(Docket Entry No. 56.) For the reasons set forth below, the Court grants Defendants' motion to

---

[1] By letter dated July 15, 2013, Plaintiff withdrew his claim of breach of covenant of good faith and fair dealing as duplicative of his breach of contract claim. (*See* Docket Entry No. 27.) During a premotion conference on November 13, 2013, Plaintiff withdrew his claim of negligent misrepresentation and negligent supervision. (*See* Minute Entry dated Nov. 13, 2013.)

strike, denies Plaintiff's motion for summary judgment and grants Defendants' motion for summary judgment.

## I. Background

United States Trust Company, N.A., ("U.S. Trust") is a division of Bank of America, N.A. ("BANA"), which is a wholly-owned subsidiary of Bank of America Corporation. (Def. 56.1 ¶ 2; Pl. Resp. 56.1 ¶ 2.) BANA acquired U.S. Trust on July 1, 2007. (Def. 56.1 ¶ 3; Pl. Resp. 56.1 ¶ 3.) Plaintiff first became a client of U.S. Trust in 1996, when he opened an investment management account ("the Investment Account"). (Def. 56.1 ¶¶ 5–6; Pl. 56.1 ¶¶ 5–6.) The parties dispute the nature of the relationship between Plaintiff and Defendants. According to Plaintiff, U.S. Trust's "overall relationship with [him] was that of a 'private wealth management company.'" (Pl. 56.1 ¶ 13.) Plaintiff claims that he was assigned a "private client manager," Frances Fernandez Beiro, "whose job function entailed management of both his borrowings from and investments with U.S. Trust's lending and investment management departments." (*Id*. ¶ 13.) According to Defendants, while U.S. Trust provided overall private wealth management as an option for clients, Plaintiff chose not to avail himself of this full-service wealth management or financial planning, but rather engaged U.S. Trust to manage only "a sliver of his overall total wealth and assets," through the Investment Account. (Def. Resp. 56.1 ¶ 13.) Defendants contend that Beiro's responsibility was "to have an understanding of [Plaintiff's'] overall relationship with U.S. Trust, an understanding of his accounts . . . and to help manage his needs and his accounts," but she never played a role with respect to any of Plaintiff's investments. (Declaration of Frances Fernandez Beiro ("Beiro Decl.") ¶ 3; Def. Resp. 56.1 ¶ 13.)

###### a.    The Investment Account and its objectives

The Investment Account was managed by different portfolio managers, including James Dempsey who managed the account from 2004 until Plaintiff closed the Investment Account in 2010.  (Def. 56.1 ¶ 8; Pl. Resp. 56.1 ¶ 8.)  When U.S. Trust was acquired by BANA in 2007, U.S. Trust and Plaintiff signed an Investment Management Agreement ("IMA") to govern the Investment Account.  (Def. 56.1 ¶¶ 26–27; Pl. Resp. 56.1 ¶¶ 26–27; Pl. 56.1 ¶ 4; Def. Resp. 56.1 ¶ 4.)  The IMA incorporates by reference an Investment Management Agreement Terms Booklet ("IMA Booklet").[2]  (Def. 56.1 ¶ 28; Pl. Resp. 56.1 ¶ 28; Pl. 56.1 ¶ 5; Def. Resp. 56.1 ¶ 5.)  Pursuant to the IMA, Plaintiff selected a "Full Investment Discretion" type of account, which provided that:

> Consistent with my investment objective and with any investment policy statement or investment guidelines ("the investment policy statement") that we agree upon from time to time, [U.S. Trust] will have sole and exclusive investment discretion over the Account ("Full Discretion Account").  I understand that any investment policy statement will be annually reviewed and updated from time to time, and that any amendment will be confirmed to me in writing and become a part of this Agreement.

(IMA, annexed to Declaration of Jeffrey Weinberger ("Weinberger Decl.") as Ex. C, and annexed to Beiro Decl. as Ex. 1, § 2.)  The Investment Policy Statement associated with the Investment Account "contained [Plaintiff's] investment objective, and was reviewed annually." (Def. 56.1 ¶¶ 38, 40; Pl. 56.1 ¶¶ 38, 40; *see, e.g.*, Investment Policy Statement dated Dec. 26, 2008, annexed to Beiro Decl. as Ex. 24 ("We understand the overall investment objective is All Fixed Income.").)  According to the parties, Plaintiff selected his own investment objective, with assistance from U.S. Trust which "helped [clients] get to that point by giving input about the markets, the opportunities and the risks that go with it."  (Def. 56.1 ¶ 41; Pl. Resp. 56.1 ¶ 41.)

---

[2]  The Court refers to the IMA and the IMA Booklet collectively as "the Contract."

According to Plaintiff, even though he chose his own investment objective, "asset allocation decisions were at all times within the portfolio manager's absolute discretion, for which [he] paid professional management fees . . . ."[3] (Pl. Resp. 56.1 ¶ 41.) The IMA Booklet states that:

> [I]f [the client has] asked [U.S. Trust] to manage only a portion of [the client's] assets, according to a targeted investment objective, [the client] understand[s] that investing in one portfolio strategy and/or not diversifying my portfolio may not be prudent, and can increase [the client's] risk of loss. Furthermore, [the client] assumes all responsibility for the suitability and overall asset allocation of [the Investment] Account.

(IMA Booklet § 4(i); Def. 56.1 ¶ 33; Pl. Resp. 56.1 ¶ 33.)

The IMA Booklet provides that as a full investment discretion account, the Investment Account was subject to U.S. Trust's "sole and exclusive authority as set forth in the [IMA] to: . . . buy, sell and retain for [the Investment Account] any securities or other investments of any kind that are consistent with [Plaintiff's] investment policy statement, including any investment restrictions which [Plaintiff has] placed on [his] Account . . . ." (Def. 56.1 ¶ 30; Pl. Resp. 56.1 ¶ 30; IMA Booklet § 1.)

According to Defendants, the investment objective for the Investment Account from June 16, 2006, through December 26, 2008, was "appreciation," described as "typically managed almost exclusively in equities." (Def. 56.1 ¶¶ 56–63; Beiro Decl. ¶ 11) The Statement of Investment Objectives dated October 25, 2005, states the investment objective for the Investment Account as "appreciation," which it describes as "almost exclusively in equities." ("Statement of Investment Objectives" dated October 25, 2005, annexed to Beiro Decl. as Ex. 3 (repeated as Ex.

---

[3] Plaintiff cites portions of the record that support the statement that he paid professional management fees to U.S. Trust, but does not provide support for the assertion that "asset allocation decisions were at all times within the portfolio manager's absolute discretion."

18) at 1.)  In December 2008, the investment objective was changed to "conservative."[4]  (Def. 56.1 ¶ 63; Pl. Resp. 56.1 ¶ 63.)

According to Plaintiff's deposition testimony, he told Dempsey in a telephone call in Fall 2007 that his investment objectives had changed.  (Deposition of Theodoras Zorbas ("Zorbas Dep."), annexed to Declaration of Elaine McChesney ("McChesney Decl.") as Ex. 1, 76:25– 77:12.)  In Fall 2007, Plaintiff had become concerned about potential fluctuations in the market, based on a conversation he had with Tom Courtney, a broker at Morgan Stanley, where Plaintiff had an investment account.  (Zorbas Dep. 78:5–23.)  Concerned about the potential for a "huge correction" in the market, Plaintiff called Dempsey in November 2007.  (*Id*. at 78:22–81:22.) Dempsey "told [Plaintiff] not to worry about it, [Courtney] doesn't know what he's talking about, . . . and, you know, [Dempsey] and U.S. Trust, they [did not] see a problem."  (*Id*. at 80:14–18.)  Plaintiff called to instruct Dempsey that he wanted to change his investment objectives, but Plaintiff "did not tell [Dempsey] what to do, what to buy, because [he] never did." (*Id*. at 80:19–24.)  When asked if he instructed U.S. Trust "to change the objective, to get out of all equities and move to some other asset allocation," Plaintiff responded "I did not."  (*Id*. at 81:2–5.)  Plaintiff explained that "I was happy [with] what [Dempsey] said.  He convinced me that Mr. Courtney is wrong and there's nothing wrong with the economy, there's nothing wrong with the stock market and I have nothing to worry about, so after that phone call I felt good."

---

[4]  In support of their assertion that Plaintiff's "accounts at other institutions reflected his aggressive investment objectives and preference for investment in equities," Defendants present evidence of investment accounts owned either by Plaintiff or by corporations owned by Plaintiff, held in other financial institutions, including Fidelity, Morgan Stanley, and UBS.  (Def. 56.1 ¶¶ 18–25.)  These accounts had aggressive or high-risk investment objectives.  (*Id*.)  Defendants do not assert that these accounts were related to the Investment Account, nor do they assert that they were on notice of these other accounts at the time they were managing the Investment Account.  The Court therefore disregards this evidence as not relevant to the instant action.

(*Id*. at 88:3–9.)  In response to a question at his deposition as to why he had not fired Dempsey after Dempsey failed to make the changes requested by him in Fall 2007, Plaintiff said: "I thought he was wrong, but then if you look at April, the rest of the month and then the market went up."  (*Id*. at 89:13–15.)

According to Plaintiff, sometime in the spring of 2008,[5] Plaintiff called Dempsey "in a panic" and, at a lunch meeting with Dempsey, Plaintiff told Dempsey that he should not have listened to him "back in November" when Dempsey "talk[ed Plaintiff] out of it" after Plaintiff told Dempsey what Courtney said.  (*Id*. at 81:9–18; 82:13–20.)  Dempsey told Plaintiff "it was just a correction, nothing to worry about," but said that "he was thinking maybe he [would] take some money and give it to [a] hedge fund."  Dempsey "didn't make a decision right there, but he was going to do — we left it that he was going to do something about it."  (*Id*. at 82:25–83:3.)  At his deposition Plaintiff was asked if they "specifically discuss[ed] whether you should move to all cash," and Plaintiff responded "I did not.  I had no — I left it up to him.  All I said, I don't want to lose my money."  (*Id*. at 83:15–19.)  When asked why he had not followed up with Dempsey after receiving monthly account statements between March and November 2008 showing that the investment objective and asset allocation had not been changed, Plaintiff responded, "when I spoke to [Dempsey] in March [2008] he never came back and then he kept telling me in March how the market is going to turn around, the market did turn around so I figure he's right again.  I trust him a hundred percent, it was his decision."  (*Id*. at 160:22–161:3.)

---

[5]  The date of this meeting is unclear from the record.  Plaintiff stated during his deposition that "when I spoke to [Dempsey] in March [2008] he never came back and then he kept telling me in March how the market is going to turn around," (Zorbas Dep. 160:22–25), suggesting the meeting took place in March 2008.

### b. The loans

Plaintiff obtained several business and personal loans from U.S. Trust.  (Def. 56.1 ¶ 10;

Pl. Resp. 56.1 ¶ 10.)  Plaintiff signed a Commercial Pledge Agreement on September 20, 2007,

for a loan of $2.75 million, pledging "all investment property . . . held by [U.S. Trust], whether

now existing or hereinafter acquired, including . . . any and all securities accounts."  (Def. 56.1

¶ 3; Pl. Resp. 56.1 ¶ 13; Commercial Pledge Agreement dated September 20, 2007

("Commercial Pledge Agreement"), annexed to Beiro Decl. as Ex. 11 at 1.)  According to the

Commercial Pledge Agreement, the aggregate value of the assets in the Investment Account had

to be at least a specified percentage of the value of the assets, known as the "advance rate."

(Def. 56.1 ¶¶ 13–16; Pl. Resp. 56.1 ¶¶ 13–16; *see* Commercial Pledge Agreement at 6.)   If the

value of the assets ever declined to the point where the amount of the loan exceeded the advance

rate, U.S. Trust had the right to make a "collateral call," which required Plaintiff to either post

additional collateral in support of the loans or pay down the amount of the loan until the loan to

collateral ratio reached the specified percentage.  (Def. 56.1 ¶¶ 13–16; Pl. Resp. 56.1 ¶¶ 13–16.)

The Commercial Pledge Agreement provided in pertinent part:

> Lender may sell the Collateral, or any part it chooses, or exercise
> any or all other rights or remedies that are in any manner provided
> for in this Agreement or provided by applicable law, upon the
> occurrence of any one or more of the following . . . [a]nything has
> happened or happens which Lender reasonably believes might
> adversely affect its interest in or the value of the Collateral or any
> other property securing any of the Liabilities . . . .  or [] the
> Collateral has declined, or threatens to decline, in value . . . ."

(Commercial Pledge Agreement at 4.)

### c. 2008 market crash and collateral calls

On July 14, 2008, U.S. Trust informed Plaintiff in writing that it was issuing a

"collateral" or "margin" call on the Investment Account.  (Def. 56.1 ¶ 111; Pl. Resp. 56.1 ¶ 111;

Pl. 56.1 ¶ 29; Def. Resp. 56.1 ¶ 29.) According to Defendants, Plaintiff instructed Dempsey to "raise cash" (that is, liquidate the stocks), in the Investment Account in order to satisfy the collateral call. (Def. 56.1 ¶ 120.) U.S. Trust also had standing instructions or permission to liquidate the stocks as needed to satisfy any collateral calls. (Def. 56.1 ¶ 121.) Plaintiff disputes giving this instruction; according to Plaintiff, after he received the July 2008 margin call letter, he received a voicemail message from Dempsey that said "do not worry about the letter, everything is okay, everything is under control." (Zorbas Dep. 114:8–23.) U.S. Trust liquidated some of the equities in the Investment Account to cash and used that cash to "cover the margin call." (email dated July 15, 2008, from Dorothy Doyle, annexed to Beiro Decl. as Ex. 40; *see* Def. 56.1 ¶ 120.)

U.S. Trust made three subsequent collateral calls on the Investment Account in 2008, the last of which was on September 5, 2008. (Pl. 56.1 ¶¶ 30–32.) In September 2008, Plaintiff chose to sell stock in the Investment Account to satisfy the last margin call. (Def. 56.1 ¶ 132; Pl. 56.1 ¶ 132.) Sometime between September 8 and September 10, 2008, Plaintiff instructed Dempsey to "liquidate the [Investment] Account into cash." (Def. 56.1 ¶¶ 133–34; Pl. Resp. 56.1 ¶¶ 133–34.)

### d. Waiver of conflict of interest

According to Defendants, on November 3, 2008, Plaintiff executed a Waiver of Conflict of Interest, Acknowledgment and Release. (Def. 56.1 ¶ 137.) This waiver provided that:

> The Bank will serve in a dual capacity as a result of your investment services/trust relationship and the Credit requested, which can create a conflict between your interest and the interests of the Bank. The Bank, as lender, shall have and may exercise the same rights and powers as a lender that is not acting as trustee and/or investment manager. Such rights and powers, including the disposition and sale of any and all assets pledged as collateral for the Credit, may be contrary to your interests and/or investment

> objectives.  Any action taken by the Bank against investment/trust
> assets pursuant to the loan documents shall not be a breach of its
> fiduciary duties under the terms governing your investment/trust
> account.

(Waiver of Conflict of Interest dated Nov. 3, 2008, annexed to Beiro Decl. as Ex. 42.)

Defendants contend that Plaintiff signed another similar waiver on January 21, 2010, and on July

30, 2010.  (Waiver of Conflict of Interest dated Jan. 21, 2010, annexed to Beiro Decl. as Ex. 43;

Waiver of Conflict of Interest dated July 20, 2010, annexed to Beiro Decl. as Ex. 44.)  These

waivers required Plaintiff to release Defendants and to indemnify them and hold BANA

harmless.  They provide in pertinent part:

> I further release, indemnify and hold harmless Bank of America,
> N.A., in its corporate capacity and in its capacity as investment
> manager and/or trustee, . . . from and against any claim, action,
> liability, loss, damage, or expense, of any nature whatsoever,
> arising out of or relating to any allegation of a conflict of interest
> or breach of fiduciary duty as a result of any action taken by Bank
> of America, N.A., as permitted in the document relating to the
> Credit.

(Waiver of Conflict of Interest dated Nov. 3, 2008, at 2.)  Plaintiff denies signing these

documents, disputes the authenticity of his signature on these documents, and asserts that he did

not meet with Beiro or waive any claims.  (Zorbas Decl. ¶ 14.)

## II.  Motion to Strike

Defendants move to strike paragraphs 6 through 9 of Plaintiff's Declaration, submitted in

support of his opposition to Defendants' motion for summary judgment, as inadmissible under

the "sham affidavit" rule.[6]  (*See* Defendants' Memorandum in Support of Motion to Strike,

Docket Entry No. 57 ("Def. Strike Mem.").)  According to Defendants, statements in this

---

[6] While Defendants move to strike paragraphs 6 through 9, their argument addresses
only paragraphs 7 through 9.  The Court does the same.

declaration directly contradict Plaintiff's deposition testimony, and raise issues that were not asserted in the Complaint. (*Id.* at 3, 9.)

Under the "sham affidavit" rule, "factual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts [the plaintiff's] own prior deposition testimony." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001). This principle "does not apply, however, if the statements 'are not actually contradictory,' or 'the later sworn assertion addresses an issue that was not thoroughly or clearly explored.'" *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 758 F.3d 202, 213 (2d Cir. 2014) (alteration omitted) (quoting *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 43 (2d Cir. 2000)); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 104 (2d Cir. 2010) ("If, however, the allegations in the affidavit, rather than contradicting, explain or amplify prior deposition testimony, then the affidavit may create a genuine issue of material fact sufficient to defeat summary judgment."); *LeBlanc v. United Parcel Serv.*, No. 11-CV-6983, 2014 WL 1407706, at *9 (S.D.N.Y. Apr. 11, 2014) (noting that "[s]ome courts have suggested . . . that [the sham affidavit rule] will not bar an affidavit when 'an issue was not fully explored in the deposition, or the deponent's responses were ambiguous.'" (alteration omitted) (quoting *Giliani v. GNOC Corp.*, No. 04-CV-2935, 2006 WL 1120602, at *3 (E.D.N.Y. Apr. 26, 2006))).

a.    **Directions regarding Investment Account in Fall 2007**

According to Plaintiff's declaration, in "late October or early November 2007," concerned about the potential for a "market crash," he met Dempsey for lunch at the Grand Luxe restaurant near U.S. Trust's local office and "instructed Dempsey to reallocate the assets in the portfolio to a more conservative mix that would be consistent with that concern, rather than 90%

or more in equities." (Zorbas Decl. ¶ 7.) Dempsey responded that "he would discuss the matter

with his colleagues in [sic] the 'team' that U.S. Trust had assigned to [Plaintiff's] accounts, and

reallocate the portfolio accordingly." (*Id*. ¶ 8.) In Spring 2008, Plaintiff "became aware that

Dempsey had not adjusted the asset allocation, which was still at 98% equities," and "again

instructed him to rebalance the assets to a more conservative mix in light of their status as

collateral for [Plaintiff's] outstanding loans." (*Id*. ¶ 9.) These allegations in the declaration

directly contradict Plaintiff's deposition testimony that he spoke to Dempsey in Fall 2007 but did

not tell him to change his investment objective.

It is unclear whether the lunch meeting with Dempsey at the Grand Luxe hotel that

Plaintiff states in his declaration took place in "late October or early November 2007" is in fact

the conversation that Plaintiff testified during his deposition took place in Fall 2007 over the

telephone. If the October/November 2007 in-person lunch meeting at the Grand Luxe hotel is a

meeting that Plaintiff never mentioned during his deposition when he was specifically asked

whether he had "at any time t[old] U.S. Trust that [his investment] objective had changed," the

Court declines to consider the statements in the declaration as to this separate, in-person

conversation with Dempsey in Fall 2007 that was not mentioned during his deposition and which

contradicts his deposition testimony.

If Plaintiff's declaration statement refers to the conversation that Plaintiff testified that he

had with Dempsey over the telephone in Fall 2007, the statement in the declaration that Plaintiff

"instructed Dempsey to reallocate the assets in the portfolio to a more conservative mix," and

that "[i]n the Spring of 2008 [Plaintiff] became aware that Dempsey had not adjusted the asset

allocation," directly contradict Plaintiff's deposition testimony and will also be disregarded by

the Court. In his deposition testimony Plaintiff unequivocally stated that he called Dempsey

with the intent to tell him to change Plaintiff's investment objective, Dempsey "talk[ed Plaintiff] out of it," (Zorbas Dep. 82:19), convinced Plaintiff that "Courtney [was] wrong and there's nothing wrong with the stock market," and "after the phone call [Plaintiff] felt good," (*id.* at 88:6–9), and did not leave Dempsey with an instruction to change to a more conservative objective. Plaintiff's deposition testimony is clear that Plaintiff ended the November 2007 telephone call with Dempsey without any expectation that the investment objective or asset allocation in the Investment Account would be changed. Accordingly, the Court declines to consider the assertions in Plaintiff's declaration that Plaintiff provided an express oral instruction to Dempsey in October or November 2007 to change the investment objective from "appreciation" to something more conservative. *See Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 556 (2d Cir. 2012) (declining "to consider those portions of plaintiffs' declarations that conflict with [one plaintiff's] prior deposition testimony").

### b. Directions regarding the Investment Account in Spring 2008

According to Plaintiff's declaration, he met with Dempsey in Spring 2008 and "instructed him to rebalance the assets to a more conservative mix." (Zorbas Decl. ¶ 9.) This statement directly contradicts Plaintiff's deposition testimony. Plaintiff testified at his deposition that he and Dempsey "left it that [Dempsey] was going to do something about it," and "All I said — I don't want to lose my money" (Zorbas Dep. 83:2–19). The statement in the declaration is also inconsistent with Plaintiff's deposition testimony that after the market turned around in March 2008, Plaintiff "figured [Dempsey was] right again. I trust him a hundred percent, it was his decision." (Zorbas Dep. 16:12–3.) Because Plaintiff's declaration statement that he "instructed" Dempsey to "rebalance" the assets in the portfolio contradicts his deposition testimony, which

makes it clear that Plaintiff did not provide a direct instruction, the Court disregards the statement.[7]

The Court therefore grants Defendants' motion to strike paragraphs 7 through 9 of Plaintiff's Declaration.

## III. Cross-Motions for Summary Judgment

### a. Standard of Review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Bronzini v. Classic Sec., LLC*, 558 F. App'x. 89, 89 (2d Cir. 2014); *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013); *Kwong v. Bloomberg*, 723 F.3d 160, 164–65 (2d Cir. 2013); *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012). The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to

---

[7] Plaintiff argues that his declaration statement is not inconsistent with the portion of his deposition testimony that discussed whether he instructed Dempsey to move to an all cash position. (*See* Zorbas Dep. 83:15–19 ("Q: Did you specifically discuss whether you should move to all cash? A: I did not.").) Plaintiff is correct that these two statements are not directly contradictory, inasmuch as this exchange, viewed in isolation, does not rule out the possibility that, by agreeing to "do something about it," Dempsey had agreed to move to a more conservative portfolio — something with more cash, but not necessarily "all cash." However, reviewing all relevant portions of the deposition testimony establishes that the declaration statement contradicts Plaintiff's testimony that he did not instruct Dempsey to change the investment objective.

defeat summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### b. Breach of Contract

Plaintiff alleges that Defendants breached the obligations of the Contract to "adhere to Plaintiff's investment objectives and obvious needs, . . . [and] to monitor the suitability of the investments in the portfolio on an ongoing basis to ensure that the portfolio at all times reflected Plaintiff's objectives." (Compl. ¶¶ 34–35.) Plaintiff argues that Dempsey's failure to act on Plaintiff's instructions to change the asset allocation from appreciation to something more conservative in Fall 2007 and Spring 2008 comprises a breach of contract. (Pl. Opp'n Mem. 10.) Plaintiff also argues that Defendants breached "implied contractual obligations," including an obligation to "act on a client's instructions." (*Id*. at 8.) Defendants argue that Plaintiff never identified the express provision of the Contract that Defendants' allegedly breached, that Defendants had no contractual duty to act on oral instructions by Plaintiff, and that there can be no implied contractual obligations where the written contract expressly disavowed any implied obligations. (Def. Mem. 7–8; Def. Reply 6–9.)

To establish a claim of breach of contract under New York law, a plaintiff must demonstrate "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011) (citing *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004)); *see also Hudson & Broad, Inc. v. J.C. Penney Corp.*, 553 F. App'x 37, 38 (2d Cir. 2014) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d

Cir. 1996)).  When interpreting a contract to determine what terms and conditions are provided in the purported agreement, "the intention of the parties should control, and the best evidence of intent is the contract itself." *Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 313 (2d Cir. 2013) (alteration, citation and internal quotation marks omitted); *see also Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985) ("As a general matter, the objective of contract interpretation is to give effect to the expressed intentions of the parties.").  The court must initially determine "whether the language the parties have chosen is ambiguous." *Id.* (quoting *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011)); *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002) ("The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." (citation omitted)).

If the language in the contract "has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion," *Marvel Characters*, 716 F.3d at 313, the contract is unambiguous, and its meaning is "a question of law for the court to decide," *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009).  "In interpreting an unambiguous contract, the court is to consider its [p]articular words not in isolation but in the light of the obligation as a whole and the intention of the parties as manifested thereby . . . but the court is not to consider any extrinsic evidence as to the parties' intentions." *Id.* (citations and internal quotation marks omitted); *see also In re AMR Corp.*, 730 F.3d 88, 98 (2d Cir. 2013) ("[C]ourts applying New York law construe a contract 'so as to give full meaning and effect to all of its provisions.'" (quoting *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996))).

If the contract is ambiguous, "extrinsic evidence as to the parties' intent may properly be considered." *JA Apparel*, 568 F.3d at 397. As a general matter, "[w]here there is such extrinsic evidence, the meaning of the ambiguous contract is a question of fact for the factfinder." *Id.* However, if the ambiguities in the contract can be "resolved through extrinsic evidence that is itself capable of only one interpretation," then the court may determine the meaning of the contract as a matter of law. *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 69 (2d Cir. 2008); *see also Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000) ("Although generally interpretation of ambiguous contract language is a question of fact to be resolved by the factfinder, the court may resolve ambiguity in contractual language as a matter of law if the evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide the contrary." (alteration, citation and internal quotation marks omitted)).

### i. Plaintiff made no change in Fall 2007 or Spring 2008.

The Court will assume without deciding that pursuant to the Contract, Plaintiff could orally give instructions to U.S. Trust and that U.S. Trust was obligated either by contract or course of dealing to follow these verbal instructions. However, even assuming that U.S. Trust was obligated to act upon any verbal instructions from Plaintiff, Plaintiff cannot show that U.S. Trust breached the Contract by failing to follow any such oral instructions since Plaintiff admits that he never gave U.S. Trust any oral instructions to change his objective.[8]

---

[8] Plaintiff's memorandum of law discusses U.S. Trust's obligation to make "changes to the asset allocation." While the Court understands this to be a reference to changing the investment objective, it is not clear that this is Plaintiff's intent. (*See, e.g.*, Pl. Opp'n Mem. 12 ("A jury could reasonably find that . . . reallocation of assets fell outside the scope of Section [II.A] entirely," and "Dempsey [was required] to act on Zorbas' instruction, [and] adjust his asset allocation accordingly.").) To the extent that Plaintiff suggests that U.S. Trust could or should have changed the asset allocation in the Investment Account even if Plaintiff did not specifically

It is undisputed that the Investment Account remained designated as "appreciation" through November 30, 2008, (*see* Monthly Account Statements, annexed to Beiro Decl. as Ex. 22 at ECF 22–25), and that the first documentation of a change in investment objective was in December 2008, (*see* Investment Policy Statement dated Dec. 26, 2008, annexed to Beiro Decl. as Ex. 24). Plaintiff argues in his opposition to Defendants' motion for summary judgment that he orally instructed Dempsey to change the Investment Account objective from appreciation to something less conservative in Fall 2007 and Spring 2008, and that U.S. Trust's failure to make this change before November 30, 2008, is a breach of the Contract requiring U.S. Trust to exercise discretion over the Investment Account "consistent with [Plaintiff's] investment objective." (Pl. Opp'n Mem. 5, 12, 17 (quoting IMA § II.A).)

Plaintiff testified at his deposition that sometime in Fall 2007 he made a telephone call to Dempsey to express concern about the potential for a "huge correction" in the stock market, but Dempsey "told [Plaintiff] not to worry about it." (Zorbas Dep. 78:22–23; 80:14–15.) Plaintiff conceded that he "did not tell [Dempsey] what to do," and, when asked if he instructed Dempsey "to change the objective, to get out of all equities and move to some other asset allocation," Plaintiff responded, "I did not." (*Id*. at 80:19–81:5.) Plaintiff also contacted Dempsey several

---

request a change to the investment objective, Plaintiff's argument is without merit. The IMA and the IMA Booklet unambiguously provide that, by selecting the Full Discretion type of investment account, Plaintiff was agreeing that U.S. Trust would have "sole and exclusive investment discretion" over the Investment Account, so long as the investments were consistent with the investment objective and investment policy statement. (IMA § II.A; IMA Booklet § 1.) This language leaves no room for ambiguity — the only manner in which Plaintiff could make any changes to the asset allocation of the Investment Account was by changing the investment objective. Because the parties unambiguously agreed that U.S. Trust would have sole and exclusive discretion over all investment decisions, subject only to compliance with the investment objective and policy statement, there is no merit to Plaintiff's claim, to the extent he alleges one, for breach of contract based on U.S. Trust's failure to comply with Plaintiff's oral instructions regarding the specific types of assets in which to invest.

months later to express dismay that Plaintiff had allowed Dempsey to "talk [Plaintiff] out of" changing the asset allocation in Fall 2007. (Zorbas Dep. 82:19.) Based on Plaintiff's deposition testimony, no reasonable jury could find that he instructed Dempsey to change his investment objective in the Fall 2007.

According to Plaintiff, when he met with Dempsey in Spring 2008 to express his concern about the market and dismay that he had allowed Dempsey to "talk him out of" his concern that there would be a market crash, Dempsey informed Plaintiff that he:

> felt it was just a correction, nothing to worry about it, however he was thinking maybe he take [sic] some money and give it to hedge fund. He didn't make a decision right there, but he was going to do — we left it that he was going to do something about it . . . . He gave me some options, because I had no options, he gave me some. Not options, he said like he was talking to himself, maybe, Ted, I'll do this, maybe I'll take some money and give it to hedge fund, so it was nothing specific. He was going to look into that, you know, I guess. I don't know, go back and think about it, talk to his — talk to other people. I don't know, I'm only guessing.

(*Id.* at 82:22–83:14.) Plaintiff acknowledged that he did not discuss with Dempsey moving his investment to "all cash" but rather left the decision to Dempsey. (*Id.* at 83:15–19.) Plaintiff also testified that Dempsey "kept telling me in March [2008] how the market is going to turn around, the market did turn around so I figure he's right again. I trust him a hundred percent, it was his decision." (*Id.* at 160:22–161:3.) Indeed, Plaintiff conceded that he "thought [Dempsey] was wrong, but then if you look at April, the rest of the month and then the market went up." (*Id.* at 89:13–15.) Plaintiff's deposition testimony shows that Plaintiff never requested or instructed that Dempsey change his investment objective. Thus, even viewing the record in the light most favorable to Plaintiff, there is insufficient evidence from which a reasonable jury could find that during the meeting in Spring 2008 Plaintiff instructed Dempsey to change the investment objective in the Investment Account from "appreciation" to something more conservative. *See*

*Guerrand Hermes v. J.P. Morgan & Co. Inc.*, 769 N.Y.S.2d 240, 243 (App. Div. 2003) (granting

summary judgment as to breach of contract claim, finding that "with respect to plaintiffs'

argument that Morgan ignored their purchase order for an initial public offering (IPO) of

'Swisscom' shares, plaintiffs failed to demonstrate that they ever made a firm request").

Therefore, Plaintiff has failed to show that Defendants breached any terms of the Contract

regarding Plaintiff's investment objective.

### ii.    Defendants had no implied obligation

Plaintiff alleges that U.S. Trust "had express and implied contractual obligations to

recommend and initiate only those investments that were suitable for Plaintiff." (Compl. ¶ 34.)

The Court construes Plaintiff's argument as asserting that U.S. Trust had an implied obligation to

change Plaintiff's investment objective once it became aware that the investment objective of

appreciation could be harmful to Plaintiff, in light of the "widely foreseen market crash" of 2008

or otherwise became aware that an aggressive investment objective was not suitable for Plaintiff.

(Pl. Opp'n Mem. 10.)

Plaintiff relies on *Ambac Assurance UK Ltd. v. J.P. Morgan Investment Management,*

*Inc.*, 928 N.Y.S.2d 253, 259–60 (App. Div. 2011), to support this claim. However, *Ambac*

*Assurance* addressed whether there were sufficient allegations to state a claim rather than

whether the plaintiff had in fact established such a claim, and also involved a plaintiff with a

conservative investment profile. *Id.* at 259–60. In *Ambac Assurance*, the plaintiff alleged that

"the defendant continued to invest in securities which it knew were entirely incompatible with

plaintiff's investment objective and stated goal to 'obtain reasonable income while providing a

high level of safety of capital.'" *Id*. at 258. The Appellate Division reversed the lower court's

grant of defendant's motion to dismiss the plaintiff's breach of contract claim. *Id*. Although the

plaintiff in *Ambac Assurance* conceded that the defendant had complied with the contractually-

provided limitation on the proportion of the account that could be invested in subprime securities, the Appellate Division found that, in light of the fact that the defendant "was actively divesting itself of the risky subprime mortgages it had originated, [it] was doing nothing about riskier subprime mortgages originated by others and held in the subject accounts" the plaintiff, "at the very least[,] has sufficiently alleged gross negligence as a basis for its breach of contract claim."[9] *Id*. at 255, 258.

Here, unlike the plaintiff in *Ambac Assurance*, whose investment objective included "providing a high level of safety of capital," Plaintiff does not proffer any admissible evidence, other than the verbal exchange between Plaintiff and Dempsey in Spring 2008, to substantiate his claim that Defendants "were or should have been on notice of the conservative investment profile of Plaintiff." (Compl. ¶ 34.) In light of the fact that the terms of the Contract required Defendant to abide by Plaintiff's chosen investment objective of "appreciation," which required that equities comprise close to 100% of the assets in the Investment Account, (*see* Statement of Investment Objectives dated Oct. 25, 2005), the Court declines to find an implied term of the Contract requiring Defendant to breach this express term by reducing the proportion of equities to a more conservative allocation.

    **b.   Breach of fiduciary duty**

Plaintiff and Defendants cross-move for summary judgment on Plaintiff's breach of fiduciary duty claim. Plaintiff moves for partial summary judgment on the basis that "U.S Trust breached its fiduciary duty to [Plaintiff] by imprudently failing to diversify his portfolio in the

---

[9] The contract at issue in *Ambac Assurance* provided that the defendant "shall have no liability for any losses 'except to the extent that such losses are judicially determined to be proximately caused by the gross negligence or willful misconduct of' the defendant." *Ambac Assurance UK Ltd. v. J.P. Morgan Investment Management, Inc.*, 928 N.Y.S.2d 253, 255 (App. Div. 2011).

face of compelling market conditions." (Pl. Mem. 1; *see also* Pl. Opp'n Mem. 22.) Plaintiff cites three sources of fiduciary duty, outside any contracts, that U.S. Trust had with respect to Plaintiff: (1) the fact that U.S. Trust acted as both a lender and an investment manager to Plaintiff, (2) the fact that U.S. Trust acted in a comprehensive wealth management or other advisory capacity, and (3) U.S. Trust's fiduciary duty as the manager of a discretionary investment account. Defendants contend that this claim is duplicative of Plaintiff's breach of contract claim, because U.S. Trust's duties as an investment manager are limited to its obligations under the IMA, U.S. Trust assumed no fiduciary duties as a lender, and Plaintiff has identified no additional source of fiduciary duty. (Def. Opp'n Mem. 6–11; Def. Mem. 27–28)

To prove a common-law tort claim of breach of fiduciary duty under New York law, a plaintiff must demonstrate: "(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011) (citing *Barrett v. Freifeld*, 883 N.Y.S.2d 305, 308 (App. Div. 2009); *Fed. Ins. Co. v. Int'l Bus. Machines Corp.*, 18 N.Y.3d 642, 649 (2012) ("a fiduciary relationship arises between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." (alteration, citation and internal quotation marks omitted)); Restatement (Second) of Torts § 874 ("One standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation.").

A breach of fiduciary duty claim sounds in tort law rather than in contract law. Therefore, "where there [is] a 'formal written agreement covering the precise subject matter of the alleged fiduciary duty,' there is no actionable tort for a breach of fiduciary duty." *Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank*, 552 F. App'x 13, 17 (2d Cir. 2014) (quoting *Pane*

*v. Citibank, N.A.*, 797 N.Y.S.2d 76, 77 (App. Div. 2005)); *see Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 58 (2d Cir. 2012) ("Under New York law, a breach of contract will not give rise to a tort claim unless a legal duty independent of the contract itself has been violated." (citing *Clark-Fitzpatrick v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987))). Thus, normally where there is a contract between the parties, no fiduciary duty beyond the terms of the contract will be found. *See EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 20 (2005) ("If the parties . . . do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them.").

Under special circumstances a fiduciary duty may be found notwithstanding the existence of a contract — specifically, when there is "a relationship of higher trust than would arise from the . . . agreement alone." *Id.*; *see Muller-Paisner v. TIAA*, 289 F. App'x 461, 466 (2d Cir. 2008) ("By their nature, arms-length commercial transactions ordinarily do not involve relationships defined by the New York courts as fiduciary. However a fiduciary duty may arise in the context of a commercial transaction upon a requisite showing of trust and confidence." (citing *In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002))); *see also Fillmore*, 552 F. App'x at 17 ("In order to establish a breach of fiduciary duty . . . , [the plaintiff] must allege that, '*apart from the terms of the contract,* the parties created a relationship of higher trust than would arise from [their contracts] alone, so as to permit a cause of action for breach of a fiduciary duty independent of the contractual duties.'" (alteration in *Fillmore*) (quoting *Brooks v. Key Trust Co. Nat'l Ass'n,* 809 N.Y.S.2d 270, 272–73 (App. Div. 2006))).

The Court turns first to whether Plaintiff has established the existence of a fiduciary duty. Plaintiff argues that there are three sources of fiduciary duty owed to him by U.S. Trust: (1) U.S.

Trust acted as both a lender and an investment manager to Plaintiff, giving rise to a fiduciary duty independent of any one contract, (Pl. Opp'n 17–21), (2) U.S. Trust was acting as a comprehensive wealth manager or otherwise in an advisory capacity with respect to Plaintiff's investments, (*id*. 29–31; Pl. Mem. 14–16), and (3) U.S. Trust had a "heightened" fiduciary duty as the manager of a discretionary investment account, (Pl. Mem. 12).  As discussed below, each of these arguments fails.

### i.  Lender and investment manager

Plaintiff asserts that U.S. Trust "as an institution owed Zorbas one global fiduciary obligation."  (Pl. Opp'n Mem. 17.)   Plaintiff further asserts that because U.S. Trust was both an investment manager and a lender, U.S. Trust's "banking relationship with [Plaintiff] was not merely at 'arm's length.'"  (*Id*. at 17.)  Plaintiff presents two possible ways that this lender and investment manager relationship created a fiduciary duty on the part of U.S. Trust: (1) As a lender with the power to execute a collateral call on the Investment Account, U.S. Trust exerted the control and dominance that is a hallmark of a fiduciary relationship, and (2) as the manager of an Investment Account that served as collateral to the loan from U.S. Trust, U.S. Trust had a fiduciary duty to manage his Investment Account in a manner that recognized the existence of its status as collateral.  Neither supports Plaintiff's claim.

### 1.  Control and dominance

Plaintiff argues that the nature of U.S. Trust's relationship with him, as both a portfolio manager managing his Investment Account, and as a lender with a security interest in that same Investment Account, creates a fiduciary duty on the part of U.S. Trust.  (*Id*. at 18–20.)  Plaintiff relies on the loan documents which give U.S. Trust the power to make a collateral call on the Investment Account, which account served as security to the loan.  (*Id*. at 19 ("Lender may sell the Collateral . . . [if] anything has happened or happens which Lender reasonably believes might

adversely affect its interest in or [] the value of the Collateral . . . ." (alteration in original) (quoting Commercial Pledge Agreement).)

The relationship between a borrower and lender is normally conducted at an arm's length and governed solely by the contract between them. *See Infanti v. Scharpf*, 570 F. App'x 85, 2014 WL 2853566, at *2 (2d Cir. 2014) ("Under ordinary circumstances, a creditor-debtor relationship does not give rise to fiduciary duties." (citing *Mfrs. Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 318 (2d Cir. 1993))); *Oddo Asset Mgmt. v. Barclays Bank PLC*, 19 N.Y.3d 584, 593 (2012) ("A debtor and creditor have no special relationship of confidence and trust, and the relationship is generally controlled by contract."); *RMP Capital Corp. v. Bam Brokerage, Inc.*, --- F. Supp. 2d ---, ---, 2014 WL 1093110, at *10 (E.D.N.Y. Mar. 17, 2014) ("It is well established that absent specific contractual language or circumstances to the contrary, the ordinary relationship between a creditor and debtor does not rise to the level of imposing a fiduciary duty upon the creditor." (quoting *Gorham–DiMaggio v. Countrywide Home Loans, Inc.*, 592 F. Supp. 2d 283, 294 (N.D.N.Y. 2008))); *Roswell Capital Partners LLC v. Alternative Const. Techs.*, 638 F. Supp. 2d 360, 368 (S.D.N.Y. 2009) ("An arm's length borrower-lender relationship is not of a confidential or fiduciary nature." (quoting *River Glen Assocs., Ltd. v. Merrill Lynch Credit Corp.*, 743 N.Y.S.2d 870 (App. Div. 2002))); *Dobroshi v. Bank of Am., N.A.*, 886 N.Y.S.2d 106, 109 (App. Div. 2009) ("This court has repeatedly held that an arm's length borrower-lender relationship is not of a confidential or fiduciary nature . . . ." (citing cases)).

Plaintiff argues the portion of the Commercial Pledge Agreement that authorized U.S. Trust to make a collateral call whenever "anything happens which [U.S. Trust] believes might adversely [a]ffect" the Investment Account, or anytime the value of the Investment Account

"'threatens to decline,' meant that U.S. Trust as 'Lender' had the ability to execute a collateral call on [the Investment Account] at whim." (Pl. Opp'n Mem. 19 (quoting Commercial Pledge Agreement at 4).) Plaintiff further argues that because U.S. Trust was empowered to execute a collateral call on the Investment Account, U.S. Trust was exerting the type of "de facto control and dominance" that gives rise to a fiduciary relationship. (Pl. Opp'n Mem. 19 (quoting *Krys v. Butt*, 486 F. App'x 153, 155 (2d Cir. 2012).) Plaintiff cites to *Krys* for the general proposition that "[a]t the heart of the fiduciary relationship lies reliance, and de facto control and dominance." [10] *Krys*, 486 F. App'x at 155. However, this general principle is insufficient to establish that any "dominance" exercised by one party to a contract, as authorized by the contract, can also give rise to an extra-contractual fiduciary duty. The "dominance" Plaintiff relies on is Defendant's ability to make a collateral call on the Investment Account, which Plaintiff authorized in the Commercial Pledge Agreement. [11] Because any alleged control and dominance as a result of U.S. Trust's ability to execute a collateral call on the Investment Account is authorized by the Commercial Pledge Agreement, it cannot also serve as the extra-contractual source of fiduciary duty. *See RMP Capital Corp.*, --- F. Supp. 2d at ---, 2014 WL

---

[10]  In *Krys*, the Second Circuit affirmed the district court's determination that the plaintiffs had failed to allege that "a personal relationship of trust and confidence" between the plaintiffs and their bank officer created a fiduciary relationship. *Krys v. Butt*, 486 F. App'x 153, 156 (2d Cir. 2012). No contract was alleged to exist between the plaintiffs and the bank officer in *Krys*.

[11]  To the extent that Plaintiff suggests that the language in the Commercial Pledge Agreement permitting Defendants to make a collateral call based entirely on Defendants' "reasonabl[e] belie[f]" that the collateral "threaten[s] to decline" in value is unfairly broad or unreasonably subjective, such a claim challenges the terms of the Commercial Pledge Agreement which Plaintiff freely and willingly agreed to and will not give rise to a breach of fiduciary duty claim. *See U.S. Bank Nat. Ass'n v. Ables & Hall Builders*, 696 F. Supp. 2d 428, 443 (S.D.N.Y. 2010) (no fiduciary duty between bank and business partnership independent of the loan agreement).

1093110, at *10 (no fiduciary duty owed by creditor to debtor where "the Factoring Agreement grants [the creditor] authority to charge the Reserve Account for any obligation owed by [the debtor] to [the creditor]."); *Krys*, 486 F. App'x at 156 ("[*E*]*very* allegation in the Amended Complaint . . . regarding [the bank employee's] fiduciary duty is either conclusory or entirely derivative of [the bank's] duty. . . . Such derivative allegations are legally insufficient to state a claim for breach of fiduciary duty against [the bank employee].").

Plaintiff correctly notes that "[a] lender-borrower relationship may give rise to fiduciary duty under New York law" where the borrower places such confidence and trust in the lender that it "invests the person trusted with an advantage in treating with the person so confiding, or an assumption of control and responsibility." *Roswell Capital Partners LLC*, 638 F. Supp. 2d at 368–69 (quoting *Mfrs. Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 318 (2d Cir. 1993)). However, in order to establish a fiduciary duty beyond the terms of the Commercial Pledge Agreement in this manner, Plaintiff must show that Defendants enjoyed an *unusual* advantage resulting from the confidence that Plaintiff placed in them, or showing that U.S. Trust "assum[ed] control and responsibility" *outside the terms provided for in the contract*. Plaintiff has made no such showing here, as any assertion of control over the Investment Account in the form of a collateral call was nothing more than U.S. Trust exercising its rights under the Commercial Pledge Agreement.[12] *See Infanti*, 570 F. App'x at ---, 2014 WL 2853566, at *2 ("Without some specific basis to believe that either [defendants] had 'assum[ed] control and

---

[12] To the extent that Plaintiff's argument about U.S. Trust's dominance and control is centered on the fact that U.S. Trust could execute its collateral call by liquidating assets in the Investment Account to cash, and then using that cash to satisfy the collateral call on the loan, such an argument is contradicted by the undisputed evidence that the Commercial Pledge Agreement expressly gives U.S. Trust the authority to "sell the Collateral, or any part it chooses," upon the occurrence of an event necessitating a collateral call. (*See* Commercial Pledge Agreement 4.)

responsibility' over [plaintiff's] affairs, or that those defendants had some special 'advantage'" that emerged from the confidence placed in them by the plaintiff, the plaintiff "could not establish that they were fiduciaries" (quoting *Yanakas*, 7 F.3d at 318)); *Yanakas*, 7 F.3d at 318 (dismissing breach of fiduciary duty counterclaim by defendant-borrower against plaintiff-lender, finding that the borrower "did not allege that [the lender] controlled the assets or operations of [a business whose loan was guaranteed by the counter-claimant] or that [the lender] otherwise exercised powers beyond those of a typical lender-creditor"); *Roswell Capital Partners LLC*, 638 F. Supp. 2d 360, 369 (S.D.N.Y. 2009) (finding that the fact that a lender obtained shares of the borrower corporation in exchange for lending it money did not give rise to a fiduciary duty, even though ownership of shares is a hypothetical form of control, where no facts were alleged to support the conclusion that the acquisition of the stocks led to an actual exertion of shareholder-based control over the borrower); *see also Iannuzzi v. Am. Mortgage Network, Inc.*, 727 F. Supp. 2d 125, 138 (E.D.N.Y. 2010) (rejecting claim that disclosure obligations imposed on mortgage lender under the Truth in Lending Act (TILA) gave rise to a fiduciary duty, noting that the argument "would effectively make virtually every lender a fiduciary of its borrower under TILA," and finding that "plaintiffs do not point to any evidence from which a rational jury could conclude that plaintiffs reposed trust or confidence in [defendant] whereby [defendant] gained superiority or influence over plaintiffs").

Construing the evidence in the light most favorable to Plaintiff, any "control and dominance" that U.S. Trust exerted over the Investment Account was authorized by the Commercial Pledge Agreement, and Plaintiff has cited no evidence of extra-contractual source of dominance or that U.S. Trust enjoyed an *unusual* advantage resulting from its security interest in the Investment Account. Therefore, there is an insufficient factual basis from which a reasonable

jury could find the existence of a fiduciary duty based on U.S. Trust's status as a lender with a

security interest in an Investment Account that it also managed.

## 2. Investment Account as collateral for the loan

Plaintiff argues in support of his motion for partial summary judgment that "U.S. Trust

breached its fiduciary duty by willfully ignoring [Plaintiff's] loans in managing his leveraged

[Investment Account] during a period of rapid market shocks." (Pl. Mem. 12; *see also* Pl. 56.1

¶¶ 22, 24; Pl. Opp'n Mem. 33 ("The fiduciary duty claim is based on Dempsey's willful failure

to consider the debt which the assets he was managing" were pledged against.).) Although this

argument is framed in terms of a breach, the underlying premise is that U.S. Trust, as manager of

the Investment Account, incurred a fiduciary duty because the Investment Account was pledged

as collateral against a loan originated by U.S. Trust.[13] Plaintiff suggests that the mere knowledge

---

[13] Plaintiff also argues that as an owner of a security interest in the Investment Account, U.S. Trust as a pledgee, owes a fiduciary duty to him as pledgor of collateral for the loan. (Pl. Opp'n Mem. 21–22 (citing *Chalasani v. State Bank of India, New York Branch*, 653 N.Y.S.2d 28 (App. Div. 1997) and *Satterwhite v. Harriman Nat'l Bank & Trust Co. of City of New York*, 13 F. Supp. 489 (S.D.N.Y. 1935)).) Under New York law, a bailee of property or pledgee of collateral is subject to a limited fiduciary duty as provided by the bailment or pledge agreement. *See Satterwhite*, 13 F. Supp. at 492 ("[W]hen the property of one man is delivered to another and accepted by the latter, the property can only be used by [the latter] in the manner in which it was agreed and intended by its owner that it should be used, and if it is used otherwise the party who received it and so used it, being a fiduciary, must explain how it came to be so used.") Plaintiff does not allege that U.S. Trust used the collateral in a manner other than "the manner in which it was agreed" to by the parties, thereby violating the terms of the Commercial Pledge Agreement, or that U.S. Trust made improper use of the collateral by making a collateral call without justification as required by the Commercial Pledge Agreement, or by retaining for itself some value from the collateral beyond what it was entitled to. Moreover, even if the Court were to find a fiduciary duty independent of the Commercial Pledge Agreement, Plaintiff does not allege that Defendants breached this fiduciary duty based on the *manner* in which they disposed of the collateral, which may have entitled Plaintiff to an accounting regarding the proceeds of the sale of the assets, as in *Chalasani*, 653 N.Y.S.2d 28. (*See* Compl. ¶¶ 22–31; Pl. Mem. 12–19; Pl. Opp'n Mem. 17–22.) In *Chalasani*, the New York Supreme Court, Appellate Division held that a plaintiff had the right to an accounting, noting that "[t]he right to an accounting rests on the existence of a trust or fiduciary relationship with reference to the subject matter of the controversy," and that "[s]uch a relationship exists here by virtue of the parties' status as pledgor

of Dempsey and others at U.S. Trust that the Investment Account was highly leveraged gave rise to a fiduciary duty, that was either triggered or breached when the market began to decline in 2008.[14] U.S. Trust argues that any duties it had with respect to the Investment Account were defined by the Contract, which did not permit U.S. Trust to change the investment objective, or require U.S. Trust to advise Plaintiff about using the Investment Account as collateral. (Def. Opp'n Mem. 27–28.)

Although not plainly stated, Plaintiff appears to argue that by extending Plaintiff several lines of credit that were secured by the Investment Account managed by U.S. Trust, U.S. Trust took on a fiduciary duty to ensure that the value of the Investment Account did not drop below the advance rate, and that U.S. Trust breached this duty by failing to *sua sponte* diversify the account once it realized that the market was undergoing a significant shock.[15] (*See, e.g.*, Pl.

---

and pledgee." *Id.* at 29. *Chalasani* reiterates the basic principle that a pledgee has a limited fiduciary duty to dispose of collateral in a manner consistent with the parties' agreement, and that a pledgor has the right to an accounting of the proceeds of any sale of collateral by the pledgee.

[14] Plaintiff cites the following facts in support of his claim:

> Dempsey, Zorbas portfolio manager, made multiple admissions to: (i) having willfully ignored the fact that Zorbas' portfolio was more than 90% allocated to equities in a period of widespread market turmoil, (ii) not even knowing the status and extent of Zorbas' borrowings against the portfolio despite ready access to such information, (iii) having relied solely on what he believed were Zorbas' "instructions," and (iv) accepted responsibility for managing a hypothecated portfolio despite having no prior experience with margin calls.

(Pl. Mem. 12.)

[15] Plaintiff also suggests that this relationship may have given rise to a conflict of interest, inasmuch as it "tacitly permitted Dempsey to shut his eyes to the loans in managing the portfolio, because the bank was always protected against market shocks even if [Plaintiff] was not." (Pl. Opp'n Mem. 21.) Plaintiff's suggestion that Defendants had a conflict of interest in their dual role as lender and investment manager is insufficient to demonstrate the existence of

Mem. 15 ("Regardless of what Mr. Dempsey believed were [Plaintiff's] instructions, his failure to rebalance the portfolio even moderately in 2007 and 2008 was actionable, given (i) its collateralization of more than $4 million in loans and (ii) unmistakable, widely acknowledged market shocks.").)

Plaintiff does not cite any authority for the proposition that a manager of an investment account that is pledged as security against a loan acquires a fiduciary duty beyond the terms of the contract governing the investment management relationship. However, Plaintiff cites extensive authority pertaining to the fiduciary duties of managers of trusts and pension funds, including the duty to diversify and the duty to inquire. Plaintiff relies on cases citing the Prudent Investor Act, N.Y. Est. Powers & Trusts Law § 11-2.3, which imposes statutory fiduciary duties on executors of estates and trustees of trusts. (Pl. Mem. 14–15); *see* N.Y. Est. Powers & Trusts Law § 11-2.3(a) ("A trustee has a duty to invest and manage property held in a fiduciary capacity

_____

an independent fiduciary duty. In *EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11(2005), the New York Court of Appeals held that a complaint sufficiently alleged that, "apart from the terms of the contract, the [parties] created a relationship of higher trust than would arise from the underwriting agreement alone," where the plaintiff had hired the defendant to "advise [plaintiff] as to a fair IPO price," the defendant had an independent fiduciary obligation "to disclose any conflict of interest concerning the pricing of the IPO." *EBC I*, 5 N.Y.3d at 20. The court found that the allegations in the complaint that the defendant "breached this duty by allegedly concealing from [the plaintiff] its divided loyalty arising from its profit-sharing arrangements with clients" were sufficient to withstand a motion to dismiss the complaint. *Id.* at 21.

Here, the fact that Defendants had extended Plaintiff several lines of credit that were secured by the Investment Account is not comparable to the conflict of interest faced by the defendant in *EBC I*. U.S. Trust's loyalty was not divided between Plaintiff and another party. In addition, Plaintiff expressly entered into two separate agreements — one governing the Investment Account, and one governing the loan. The terms of the former required Defendants to manage the Investment Account consistent with the investment objective, which, as discussed above, was indisputably "appreciation" until December 2008. The terms of the latter pledged "all investment property . . . held by [U.S. Trust], . . . including any and all securities accounts," as collateral against the loan. The fact that U.S. Trust was both the originator of the loan and the manager of the Investment Account, without more, is not the type of "special circumstance" that gives rise to an extra-contractual fiduciary duty.

in accordance with the prudent investor standard defined by this section.").[16] While Plaintiff

concedes that the Prudent Investor Act applies to trustees, which is "not present here," he asserts

that it has been applied to investment managers such as U.S. Trust.[17]  (*See* Pl. Mem. 13 ("While

the [Prudent Investor] Act expressly governs the conduct of trustees (not present here) it has

been applied to investment managers such as U.S. Trust.").)  Plaintiff cites no authority, and the

---

[16]  Plaintiff cites the following cases, among others: *In re JP Morgan Chase Bank*, 910 N.Y.S.2d 405 (Surr. Ct. 2010) ("[T]he prudent investor rule puts diversification at the forefront of the fiduciary's obligations,"), *aff'd sub nom. In re Hunter*, 955 N.Y.S.2d 163 (App. Div. 2012); *In re Hunter*, 955 N.Y.S.2d at 165 ("[P]etitioner violated both the prudent-person rule of investment and the Prudent Investor Act during the relevant time periods by maintaining the concentration of Kodak stock in the Eighth (B) Trust for more than 20 years." (citing N.Y. Est. Powers & Trusts Law § 11-2.3((b)(3)(C)), *leave to appeal denied*, 981 N.Y.S.2d 670 (2014); *Robertson v. Cent. Jersey Bank & Trust Co.*, 47 F.3d 1268, 1275 (3d Cir. 1995) ("Diversification is a uniformly recognized characteristic of prudent investment and, in the absence of specific authorization to do otherwise, a trustee's lack of diversification would constitute a breach of its fiduciary obligations." (citing Restatement (Third) of Trusts § 229(d)).  These cases refer to trustees.  There is no evidence in the record, that Defendant was a trustee or that Plaintiff was the beneficiary of a trust. "Under New York law, a valid trust has four elements: (1) a designated beneficiary, (2) a designated trustee, (3) property sufficiently identified, and (4) the delivery of the property to the trustee." *Sun Life Assur. Co. of Canada v. Gruber*, 334 F. App'x 355, 357 (2d Cir. 2009) (citing *Gross v. Gross*, 833 N.Y.S.2d 563 (2007)).  Plaintiff does not argue, and there is no evidence, as to any of these elements.

[17]  Moreover, even if the Prudent Investor Act applied in this situation, it provides that a trustee is under an obligation to "tak[e] into account the purposes and terms and provisions of the governing instrument," and that "[a] trustee is not liable to a beneficiary to the extent that the trustee acted in substantial compliance with the prudent investor standard or in reasonable reliance on the express terms and provisions of the governing instrument."  N.Y. Est. Powers & Trusts Law § 11-2.3(b)(1); (b)(3)(C).  Here, because the express terms of the Contract, the applicable governing instrument, provides that U.S. Trust was to manage the Investment Account consistent with Plaintiff's investment objective, even if the Prudent Investor Act were applicable, U.S. Trust would not have been in violation of the relevant provision as Plaintiff has not alleged that U.S. Trust acted inconsistent with his investment objective of "appreciation."

Court is unable to find any, to support the proposition that the Prudent Investor Act applies to

managers of an investment account, like the Investment Account in this case.[18]

Plaintiff's argument that U.S. Trust had a fiduciary duty to diversify the Investment

Account in light of its status as collateral for the loan incorrectly assumes that U.S. Trust was

subject to the Prudent Investor Act, as a manager of a discretionary account.  In light of

Plaintiff's concession that U.S. Trust was not a trustee, (*see* Pl. Mem. 13), and that his

relationship with U.S. Trust with respect to the Investment Account was governed by an express

contract, the fact that the Investment Account was pledged as security against a loan does not

give rise to a fiduciary duty independent of the Contract.

Similarly, Plaintiff's assertion that Defendants owed him a fiduciary responsibility

"merely by having charged him management fees," is misplaced as it is premised on case law

discussing the imposition of a duty of care on a professional financial advisor by the Prudent

Investor Act.  (*See* Pl. Mem. 13 (citing *In re Estate of Witherill*, 828 N.Y.S.2d 722 (App. Div.

---

[18] Plaintiff also cites cases addressing whether ERISA trustees' failure to diversify violated their statutory fiduciary duties to argue that U.S. Trust had a similar fiduciary duty.  (Pl. Mem. 10–11 (citing *Lanka v. O'Higgins*, 810 F. Supp. 379, 386-87 (N.D.N.Y. 1992) and *Liss v. Smith*, 991 F. Supp. 278, 302 (S.D.N.Y. 1998)).)  ERISA imposes a statutory fiduciary duty on the administrators of employee retirement funds, which is not at issue here.  *See* 29 U.S.C. § 1109 ("Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable"); *Fed. Ins. Co. v. Int'l Bus. Machines Corp.*, 18 N.Y.3d 642, 649 (2012) ("ERISA's definition of fiduciary [has been described] as 'artificial'" (citing *Mertens v. Hewitt Associates,* 508 U.S. 248, 255 n.5 (1993))).  Plaintiff concedes that these cases addressed claims brought under ERISA rather than under New York common law, but asserts that the cases nevertheless "control" the outcome here, as ERISA claims are "interpreted under principles applicable to trustees under the common law of trusts."  (Pl. Mem. 11 (citing *Marshall v. Teamsters Local 282 Pension Trust Fund*, 458 F. Supp. 986, 990 (E.D.N.Y. 1978), *Donovan v. Bierwirth*, 538 F. Supp. 463, 471 (E.D.N.Y. 1981) *modified*, 680 F.2d 263 (2d Cir. 1982) and *Leigh v. Engle*, 727 F.2d 113, 123 n.19 (7th Cir. 1984)).)  Plaintiff's claims here are not brought under the "common law of trusts."

2007)).)  In *Witherill*, the Appellate Division held that a financial advisor breached his fiduciary duty to provide prudent financial advice.  *Witherill*, 828 N.Y.S.2d 722, 724 (App. Div. 2007) ("Because he claimed to be a skilled financial advisor and was paid handsomely for such services during decedent's lifetime, he was obligated to "exercise such diligence in investing and managing assets as would customarily be exercised by prudent investors of discretion and intelligence having special investment skills." (citing N.Y. Est. Powers & Trusts Law § 11-2.3(b)(6)).

Because there is no evidence of a special relationship of confidence and trust as a result of U.S. Trust's role as both a lender and an investment manager, Plaintiff has not established a fiduciary duty beyond the contractual relationship between the parties.

### ii.  Comprehensive wealth manager/investment advisor

Plaintiff additionally asserts that U.S. Trust had a fiduciary duty that arose from the fact that it offered comprehensive wealth management services and expertise which Plaintiff came to rely on.  (Pl. Mem. 13–15; Pl. Opp'n Mem. 29.)  Plaintiff's argument is not supported by any evidence in the record.

Plaintiff argues that because he engaged both the lending and investment services of U.S. Trust, U.S. Trust was a "full-service 'wealth management trust company,'" and therefore owed an independent fiduciary duty to Plaintiff.  (Pl. Mem. 12; *see also id*. at 2 ("Among its wealth management services, U.S. Trust also made credit facilities available to Zorbas.").)  Plaintiff asserts that he came to "repose" great confidence in U.S. Trust, paying significantly for their "expertise" because of U.S. Trust's dual relationship with him as a lender and an investment manager, the fact that it "held itself out to the entire high-net-worth world as a 'private management trust company,'" and manager, and the fact that it assigned Beiro to Plaintiff as a

"private client manager."[19]  (Pl Opp'n Mem. 20–21.)  Defendants argue that its fiduciary

obligations were limited to matters agreed to in the contract, which did not include advisory

services.  (Def. Mem. 24; Def. Reply 28–29.)

The evidence in the record establishes that Plaintiff had two contracts with U.S. Trust: the

Contract to manage Plaintiff's Investment Account, and the Commercial Pledge Agreement

governing the loan made by U.S. Trust to Plaintiff.  Because these express contracts govern the

two relationships that Plaintiff had with U.S. Trust, Plaintiff's subjective beliefs and conclusory

allegations that a "special" relationship existed are insufficient to establish a fiduciary duty.  *See*

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 195

(S.D.N.Y. 2011) (finding the allegation that "[t]he owners repose their confidence and trust in

---

[19]  Defendants assert that, although U.S. Trust offers comprehensive wealth management
and investment adviser services to the public, Zorbas had chosen not to avail himself of or pay
for these services, and instead limited himself to a single Investment Account, which was
governed by the IMA, and to receiving several loans.  (*See* Def. Resp. 56.1 ¶ 3.)  Plaintiff's
assertion that the relationship between U.S. Trust and himself was one of comprehensive wealth
management that could give rise to an independent fiduciary duty relies on portions of the record
that do not support this premise.  For example, while Plaintiff asserts that U.S. Trust "served as
an investment advisor and private wealth manager" to him, (Pl. 56.1 ¶ 3), citing to the
Defendants' Answer, the cited paragraph states only that "among various services offered by
U.S. Trust are investment advisor services and that the investment relationship between Plaintiff
Zorbas and U.S. Trust at pertinent times was governed by an investment manager agreement;
[and] the lending relationship between BANA and Plaintiff Zorbas was also governed by various
loan documents and promissory notes,"  (Ans. ¶ 4).  Plaintiff also cites the statement of the
managing director Dorothy Doyle that "[t]he trust world does not manage money.  The
investment management manages portfolios for clients, but a team of four core people circle
around all clients to make sure that we're meeting need."  (Pl. Mem. 5 (citing Doyle Dep. 21:10–
14).)  In fact, Doyle's testimony, understood in context, directly contradicts Plaintiff's argument,
inasmuch as Doyle is drawing a distinction between the "trust relationship," and the "investment
management" relationship that U.S. Trust had with clients.  (*See* Doyle Dep. 23:19–21:8 ("[T]he
trust officer's role is to first and foremost be the fiduciary for relationship and that means that if
there is an investment relationship or a trust relationship for a client, the trust officer is making
sure that we are acting with prudence in conformity with any documentation, especially if it's a
trust relationship more so than just a discretionary investment account.").  There is no evidence
in the record that U.S. Trust had a trust relationship with Plaintiff.

the servicer" insufficient to give rise to a fiduciary relationship between certificate holders and trustee of a commercial securitization trust); *Childers v. New York & Presbyterian Hosp.*, No. 13-CV-5414, 2014 WL 2815676, at *9 (S.D.N.Y. June 23, 2014) ("[C]ourts routinely have held that conclusory allegations of a special relationship or complete trust and confidence are insufficient to state a claim of a fiduciary duty." (alteration omitted) (quoting *Abercrombie v. Andrew Coll.,* 438 F. Supp. 2d 243, 275 (S.D.N.Y. 2006))).

Plaintiff suggests that his reliance on U.S. Trust's "expertise" imposed a duty on U.S. Trust to *sua sponte* diversify the assets of the portfolio, (*see* Pl. Mem. 6), an action that would have violated the express terms of the Contract requiring U.S. Trust to manage the portfolio in a manner consistent with Plaintiff's chosen investment objective. Plaintiff's unsupported assertions that he reasonably came to rely on U.S. Trust's "expertise" is insufficient to establish that U.S. Trust had a duty to diversify the assets in the Investment Account on its own absent evidence that U.S. Trust held itself out as being willing or able to play this role, or that U.S. Trust actually played this role in their relationship. *Cf. Muller-Paisner*, 528 F. App'x at 39 (denying summary judgment on breach of fiduciary duty claim where "[t]he record evidence, viewed in the light most favorable to the estate, would permit a jury to infer that TIAA had voluntarily assumed a duty to provide clients with advice about the investment products appropriate to their situations," and noting that "[e]vidence of statements made by TIAA to induce trust and reliance are relevant to the fiduciary inquiry"); *Sergeants Benev. Ass'n Annuity Fund v. Renck*, 796 N.Y.S.2d 77, 79 (App. Div. 2005) (plaintiff's allegation that the defendants "held themselves out as experienced in the field of investment consulting and management" weighed toward finding fiduciary relationship). The Contract between Plaintiff and U.S. Trust required U.S. Trust to manage the Investment Account in a manner consistent with his selected

investment objective, and there is nothing in the record to support Plaintiff's belief that U.S. Trust should have acted in a manner inconsistent with his selected investment objective, or that its failure to do so comprised a breach of fiduciary duty.

The Court notes that Plaintiff's motion for partial summary judgment appears to be based on the premise that U.S. Trust was acting as a professional investment advisor with respect to Plaintiff's investments, and not merely in a management capacity. (*See, e.g.*, Pl. 56.1 ¶ 3; Pl. Mem. 13–15; Pl. Opp'n Mem. 29 ("Professionals such as investment advisors, who owe fiduciary duties to their clients, 'may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties.'" (citing *Bullmore v. Ernst & Young Cayman Is.*, 846 N.Y.S.2d 145 (App. Div. 2007), *aff'd*, 18 N.Y.3d 341 (2011))).) However, Plaintiff concedes that U.S. Trust was not acting in an advisory capacity with respect to the Investment Account. (*See* Pl. Opp'n Mem. 22–23 ("Unlike U.S. Trust, defendants in *AI Sulaiman* [*AI Sulaiman v. Credit Suisse Sees. (Europe) Ltd. Plurimi Capital LLP*, [2013] 2011 FOLIO 939, EWHC 400 (Comm) (Eng.)], 'acted in an advisory and not a discretionary capacity.'").) Therefore, any fiduciary duties that may apply to professional investment advisors, and that Plaintiff cites in support of his argument that U.S. Trust's "comprehensive" wealth management role and general "expertise" gave rise to an independent fiduciary duty, do not apply to U.S. Trust.[20]

_____

[20]  Under New York law, certain "[p]rofessionals . . . may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties."  *See Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 551 (1992).  Investment advisors may be considered professionals under New York law and held to a professional standard of care, for which courts impose an elevated fiduciary duty.  *See Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*, 915 N.Y.S.2d 7, 17 (App. Div. 2010) ("An investment advisor may be considered a professional" (citing *Bullmore v. Ernst & Young Cayman Is.*, 846 N.Y.S.2d 145 (App. Div. 2007) ("Professionals such as investment advisors, who owe fiduciary duties to their clients, may be

In sum, no fiduciary duty arises from the fact that U.S. Trust offered comprehensive wealth management services to others, or from the confidence Plaintiff unilaterally placed in U.S. Trust to use its expertise or advise Plaintiff to change his investment objective when they believed that it was too risky for the market.

### iii. Discretionary account manager

Plaintiff also asserts that "managers of discretionary accounts such as Zorbas's account with U.S. Trust owe their client 'heightened' fiduciary responsibilities."[21] (Pl. Mem. 12 (citing *Sergeants*, 796 N.Y.S.2d at 78).) Plaintiff is correct that managers of discretionary accounts owe their clients a fiduciary duty, embodied in their agreement with their clients, to manage the account in a manner that comports with the client's investment objective, but inaccurately

---

subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties, since in these instances, it is policy, not the parties' contract, that gives rise to a duty of care." (citation and internal quotation marks omitted))), *aff'd*, 18 N.Y.3d 341 (2011). Here, there is no evidence in the record that U.S. Trust agreed to take on a professional investment advising role with respect to the Investment Account, which would have been beyond the terms of the contract. Plaintiff hired U.S. Trust to act as an investment manager for a "Full Discretionary Account," which authorized U.S. Trust to "have sole and exclusive authority as set forth in the Agreement to . . . buy, sell and retain for my Account any securities or other investments of any kind that are consistent with my investment policy statement, including any investment restrictions which I have placed on my Account . . . ." (Def. 56.1 ¶ 30; Pl. Resp. 56.1 ¶ 30; IMA Booklet § 1.) The contract delegates all authority to U.S. Trust to decide what types of investments to purchase on behalf of Plaintiff and does not require U.S. Trust to give Plaintiff any advice about the Investment Account. In contrast to a Full Discretionary Account, U.S. Trust also offers a "Non-Discretionary Account," which Plaintiff did not select, and which provides that U.S. Trust would "advise [the client] when [it] think[s] it desirable to buy, sell, exchange or otherwise change any of the investment held in my account." (IMA Booklet § 2; *see* Def. 56.1 ¶¶ 29 –30; Pl. Resp. 56.1 ¶¶ 29–30; IMA § II.A.)

[21] Plaintiff contends that the United States Office of the Comptroller of the Currency ("OCC") "extends the fiduciary standards applicable to national banks such as U.S. Trust and Bank of America as to all actions taken by them '[in] any capacity in which [they] possess[ed] investment discretion.'" (Pl. Mem. 14 (alteration in original) (quoting 12 C.F.R. § 9.2(e)).) Although Plaintiff does not explain these "fiduciary standards applicable to national banks," section 9.11 of the cited OCC regulation simply states that "[a] national bank shall invest funds of a fiduciary account in a manner consistent with applicable law." 12 C.F.R. § 9.11.

characterizes this duty as a "heightened" one.  *See United States v. Wolfson*, 642 F.3d 293, 295 (2d Cir. 2011) (noting that "a relationship of trust and confidence does exist between a broker and a customer with respect to those matters that have been entrusted to the broker . . . . [M]ost commonly, this relationship exists in situations in which a broker has discretionary authority over the customer's account." (internal quotation marks omitted) (quoting *United States v. Szur*, 289 F.3d 200, 211 (2d Cir. 2002) and *United States v. Skelly*, 442 F.3d 94 (2d Cir. 2006))). While Plaintiff is correct that an investment manager acting in a discretionary capacity has a fiduciary duty, such a duty is as set forth in the contract; there is no higher duty that is imposed as a matter of law on this relationship.  *See Guerrand Hermes*, 769 N.Y.S.2d at 242 (affirming summary judgment on breach of fiduciary duty claim against manager of discretionary investment account where "the very purpose of the investment strategy, as set forth in the 'Objective' section, was to invest in emerging markets debt securities"); *cf. Ambac Assurance*, 928 N.Y.S.2d at 258 (reversing grant of motion to dismiss breach of fiduciary duty claim where plaintiff alleged that the defendant, hired to manage an investment account with the stated objective to "obtain reasonable income while providing a high level of safety of capital" had breached its fiduciary duty when it "continued to invest in securities which it knew were entirely incompatible with plaintiff's investment objective and stated goal").  Here, the evidence in the record demonstrates that U.S. Trust did not fail to manage the Investment Account in accordance with Plaintiff's selected investment objective of "appreciation" and therefore did not breach its fiduciary duty as manager of a discretionary Investment Account.

Plaintiff argues that employees of U.S. Trust were "empowered to 'rebalance the portfolio when needed.'"  (*See* Pl. Mem. 6 ("[B]oth the Portfolio Manager (Dempsey) and [the] Private Client Manager (Fernandez) were empowered to 'rebalance the portfolio when needed.'"

(quoting Doyle Dep. 27:3–6)); Pl. Opp'n Mem. 29 ("As here, the claims [in Sergeants,796 N.Y.S.2d 77] were based primarily on failure to rebalance asset allocation, with allegations of reliance on defendants' professional expertise.").) While it is not clear in what sense Plaintiff uses the term "rebalance the assets" here,[22] in *Sergeants*, 796 N.Y.S.2d 77, the Appellate Division used it to refer to the process of calibrating an investment account to comport with its designated objective. In *Sergeants*, the Appellate Division found that the plaintiff had sufficiently pled evidence of a breach of fiduciary duty and loss causation against two individual employees of an investment advisor and management firm, in part because the plaintiff alleged that "under the Rencks' guidance, the Fund's asset allocation ballooned from 60% equities — consistent with the asset allocation model — to 81% equities."[23] *Sergeants*, 796 N.Y.S.2d at 79. Here, Plaintiff does not argue, and there is no evidence, that U.S. Trust managed the account in a manner incompatible with Plaintiff's chosen investment objective of "appreciation." According to the Statement of Investment Objectives dated October 25, 2005, an objective of "appreciation"

---

[22] Plaintiff appears to use the term "rebalance" throughout his briefings to refer to the act of changing the investment objective and thereby changing the asset allocation of the Investment Account. Plaintiff's use of this term is different from the manner in which it was used by individuals deposed in this case. According to Dempsey, rebalancing is the calibration that is occasionally done to ensure that an account that is designated as, *e.g.*, 68% securities remains at 68% securities. For example, if the value of the securities in an account doubled over the course of a year while the remaining assets in the portfolio did not change in value, resulting in the value of the securities comprising 89% of the total value of the investment account, "rebalancing" is the act of selling a portion of the securities to return their value to 68% of the total value of the account. (*See* Dempsey Dep. 57:11–58:7.) Defendant notes that Plaintiff "misuses" the term "rebalance," and that the United States Office of the Comptroller of the Currency defines this term as "buying or selling investments to make allocations conform to their limits." (Def. Reply. 29.)

[23] Although the failure to rebalance the asset allocation in *Sergeants* presumably would have comprised a breach of contract claim under the terms of the agreement between the plaintiffs and the investment management company, the Appellate Division's decision appears to have hinged on the fact that the claim was alleged directly against the individual defendants.

"is comprised of 100% S&P 500." [24]  (October 2005 Investment Policy Statement.)  The

Investment Account remained close to 100% securities until December 2008.  (*See* Monthly

Account Statements, annexed to Beiro Decl. as Ex. 22.)

Plaintiff has not established that U.S. Trust owed him any fiduciary duty outside of the

Contract and the Commercial Pledge Agreement, and therefore has no breach of fiduciary duty

claim.  The Court grants Defendants' motion for summary judgment on this claim.

### c.  Negligence

Plaintiff alleges that Defendants breached their duties "of reasonable care in . . . advising

him about the investments in the brokerage account . . . in managing, maintaining and

supervising Plaintiff's account in a manner consistent with Plaintiff's investment objectives . . .

[and] the debt levels associated with the account."  (Compl. ¶¶ 15–17.)  Defendants argue that

Plaintiff's negligence claim is duplicative of his breach of contract claim, as Plaintiff has failed

---

[24]  Nor has Plaintiff demonstrated the presence of circumstances that would reasonably give rise to a fiduciary duty outside the terms of the Contract.  Plaintiff cites to *Bayerische Landesbank*, *New York Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42 (2d Cir. 2012),which held that the plaintiff, a third party to a contract between the defendant and an investment company that held a collateralized debt obligation (CDO) in which the plaintiff had invested, had successfully pleaded a claim of negligence against the manager of the CDO, notwithstanding the existence of a contract between the defendant and the investment company.  *Bayerische Landesbank*, 692 F.3d at 58.  The Second Circuit held that the plaintiff had sufficiently alleged the presence of a duty independent of the contract, as required for a claim of negligence, based on the plaintiff's allegation that it "detrimentally relied on [the defendant's] representations" of how it would select investment products and manage the portfolio.  The plaintiff in *Bayerische* alleged that it "was induced to purchase the Notes at issue" through the defendant's representations made in meetings and through marketing materials that the defendant's "interests were aligned with" the investors' interests, and that the defendant would manage the investment portfolio "in a conservative and defensive manner . . . .'"  *Bayerische Landesbank*, 692 F.3d at 58.  Here, in contrast, Plaintiff does not argue that U.S. Trust induced him to open the Investment Account or otherwise detrimentally relied on any promise that it would manage the Investment Account in any manner other than as required by the investment objective.

to identify any duty that has been breached other than Defendants' duties under the Contract.[25] (Def. Mem. 11–12.)  The Court agrees with Defendants.

To establish a *prima facie* case of negligence under New York law, "a plaintiff must demonstrate '(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty, and (3) injury to the plaintiff as a result thereof.'"  *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 758 F.3d at 210 (quoting *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 428 (2d Cir. 2013) and *Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 333 (1981)); *see also Solomon by Solomon v. City of New York*, 66 N.Y.2d 1026, 1027 (1985) ("To establish a prima facie case of negligence, a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom"); *Jiminez v. Shahid*, 922 N.Y.S.2d 123, 124 (App. Div. 2011) ("The elements of a common-law negligence cause of action are a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately resulting there from.").  Furthermore, Plaintiff must establish that his injury was foreseeable.  *See Sanchez v. State of New York*, 99 N.Y.2d 247, 252 (2002) ("[L]iability does not attach unless the harm is within the class of reasonably foreseeable hazards that the duty exists to prevent.").

"Under New York law, a breach of contract will not give rise to a tort claim unless a legal duty independent of the contract itself has been violated."  *Bayerische Landesbank*, 692 F.3d at 58; *see also Fillmore*, 552 F. App'x at 19 ("'Claims for gross negligence [and] willful misconduct sound in contract rather than tort' where, absent a contractual agreement, the defendant 'would have had no duty to plaintiffs.'" (alteration in *Fillmore*) (quoting *OFSI Fund*

---

[25]  Defendants also argue that even if they had a duty independent of the Contract, the economic loss doctrine, which bars recovery in tort for purely economic losses, bars Plaintiff's negligence claim.  (*Id.* 13–15.)

*II, LLC v. Canadian Imperial Bank of Commerce*, 920 N.Y.S.2d 8, 10 (App. Div. 2011))).

However, "where a party to a contract can properly allege the breach of a duty owed to the

plaintiff, that exists separate and apart from the contract," "New York courts recognize a claim in

tort under [these] circumstances . . . ." *Avazpour Networking Servs., Inc. v. Falconstor Software,*

*Inc.*, 937 F. Supp. 2d 355, 361 (E.D.N.Y. 2013); *see also DEF v. ABC*, 366 F. App'x 250, 253

(2d Cir. 2010) ("Banco Central's claim is not predicated on a mere breach of contract. Instead, it

'spring[s] from circumstances extraneous to, and not constituting elements of, the [alleged]

contract. . . ." (quoting *Clark-Fitzpatrick, Inc*, 70 N.Y.2d at 389)).

Plaintiff asserts that the fiduciary duties identified in support of his breach of fiduciary

duty claim are sufficient to establish independent duties owed to Plaintiff by Defendants, breach

of which can give rise to liability for negligence.  (Pl. Opp'n Mem. 34–35.)  As discussed above,

Plaintiff has not established any duties independent of the Contract.  Thus, Plaintiff's argument

that Defendants breached the duty of ordinary care by entrusting a leveraged account to someone

with no experience working with leveraged accounts, (Pl. Opp'n Mem. 35), is without merit, as

the sole source of duty imposed on Defendants is set forth in the IMA.  Because Plaintiff has not

established an independent source of duty "spring[ing] from circumstances extraneous to" the

Contract, Plaintiff's negligence claim fails.

### III. Conclusion

For the foregoing reasons, the Court grants Defendants' motion to strike, denies Plaintiff's motion for partial summary judgment as to his breach of fiduciary duty claim, and grants Defendants' motion for summary judgment as to all of Plaintiff's claims.  The Clerk of Court is directed to close the case.

SO ORDERED:

_____s/MKB_____
MARGO K. BRODIE
United States District Judge

Dated: September 29, 2014
       Brooklyn, New York